**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT STEINBUCH** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-0188 (RMC)** |
| ) | |
| **ROBERT AND JOAN KAPELL** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM OPINION**

Attorney Robert Steinbuch has sued husband-and-wife Robert and Joan Kapell for

defamation and related claims after the Kapells sent a series of letters to various government entities

and his employer, the Internal Revenue Service ("IRS"), charging him with unethical behavior and

professional misconduct. An ensuing investigation cleared Mr. Steinbuch of all charges but he felt

constrained to leave the IRS. The parties have filed cross motions for summary judgment, which

will be granted in part and denied in part.

**I.  BACKGROUND**

Diane Steinbuch is the twin sister of plaintiff Robert Steinbuch. Ms. Steinbuch

entered into an oral contract to purchase the home of the Kapells. The Kapells thereafter received

an offer for more money and told Ms. Steinbuch that she had to meet the higher price or they would

sell to the second bidder. Ms. Steinbuch retained counsel, who was assisted on a pro bono basis by

Robert Steinbuch, who is a lawyer and was at the time Deputy Senior Counselor to the

Commissioner of the IRS. Ms. Steinbuch then instituted suit to force the Kapells to conform to the

oral agreement to sell.  The Kapells became irate at the free representation given to Ms. Steinbuch by her brother, which they assert allowed her allegedly frivolous lawsuit to ultimately proceed to an adverse summary judgment decision against Ms. Steinbuch and then to an adverse appellate decision against her.  The Kapells decided that they could rid themselves of the expense of defending against Ms. Steinbuch's lawsuit if they could deprive her of the free legal services of her brother.

The Kapells knew that Mr. Steinbuch worked for the federal government.  For reasons that are not clearly stated in the record, they decided to write to the Immigration and Naturalization Service ("INS")[1] and complain about Mr. Steinbuch's pro bono representation of his sister.  When the INS proved not to be Mr. Steinbuch's employer, they expanded the objects of their letters, managing to contact two separate branches of the government and numerous separate agencies in the process.  Mr. Steinbuch alleges that these letters were defamatory, not subject to any privilege, injured his reputation, and were published with actual malice or recklessly or negligently.

- On October 22, 2002, Robert Kapell faxed a complaint letter to Peter Anderson of the INS.  He wrongly asserted that Mr. Steinbuch is "a lawyer with the INS" and then stated that Mr. Steinbuch had "advised his sister to secretly tape a conversation in our home, as if this [were] a government criminal investigation into organized crime."[2] Mr. Kapell asserted that "we believe that Steinbuch's purpose is to bully us into selling our house to his twin sister, and to force us to spend money to defend ourselves in court regarding a matter that doesn't even belong in court."  The Kapells asked the INS to "see to it that their employees do not carry out personal campaigns against law abiding US citizens.  The INS doesn't have enough to do without having its employees harassing US citizens for personal reasons!"  Opposition to Defendants' Motion for Summary Judgement and Plaintiff's Motion for Summary Judgement ("Pl.'s Mot.") at 5-6; *see also* Pl.'s Mot., Ex. C ("Ex. C") at 11-12 ( Letter # 1).

---

[1]  The former INS is now the Bureau of Immigration Control and Enforcement ("ICE"), which is part of the Department of Homeland Security.

[2]  Had Mr. Steinbuch so advised his sister, which each denies, such conduct could have violated New York Bar Disciplinary Rule, DR7-104.

- On October 28, 2002, the Kapells sent a similar complaint letter to the Inspector General of the United States Department of Justice ("DOJ"). Mr. Kapell added, "I am a little concerned that employees in the INS may not be inclined to vigorously pursue this complaint because Mr. Steinbuch has an important position with the INS." Ex. C at 10 (Letter #2).

- Because Mr. Steinbuch did not work for the INS, that agency referred the allegations of misconduct to the Office of Professional Responsibility of the DOJ. The referring memorandum stated that Mr. Kapell had filed a complaint against Mr. Steinbuch alleging unethical behavior and professional misconduct. The memorandum interpreted the Kapells' claim as alleging that Mr. Steinbuch was engaged in "an impermissible outside practice of law [in violation of] 28 C.F.R. § 3801.106(b)(1)(i)" and had violated New York Bar Disciplinary Rule 7-104, due to the alleged tape recording when the Kapells were represented by counsel. The memorandum added, "[b]eyond this possible professional conduct issue, we do not know whether this non-consensual tape recording violate[d] New York law." Ex. C at 12 (Letter #3).

- On October 29, 2002, Mr. Kapell wrote to Senator Hillary Clinton to complain:

  > My wife and I feel that we are being legally harassed by a lawyer who is an employee of the DOJ. The person harassing us is Mr. Robert E. Steinbuch who works for the INS. We have filed a complaint with the INS because, after speaking with Mr. Peter Anderson of the Ethics Office of the INS . . . . we believe that Mr. Steinbuch is not only legally harassing us, but that in the process he may be violating INS policy. We are asking you to look into this case to make sure that our complaint is not swept under the carpet because Mr. Steinbuch has a position of importance in the INS. . . . We believe that he advised his sister to secretly tape a conversation in our home, as if this [were] a government criminal investigation into organized crime. . . . He has continued to submit briefs to the court arguing that there was a verbal agreement when he knows, as an attorney licensed in the State of New York, that NYS law requires a written contract . . . . We believe his purpose is to bully us into selling our house to his twin sister and to force us to spend money to defend ourselves in court regarding a matter that doesn't belong in court. We are requesting that you look into this complaint because we believe we are being legally harassed by an employee of the INS and that . . . Mr. Steinbuch may have violated official policy of the INS and the DOJ. We do not think DOJ employees should be taking time off from work to carry out personal campaigns against law abiding US citizens. We do not believe that DOJ policy permits its employees to

3

submit briefs on behalf of private law firms or to represent their siblings in court.  Ex. C at 14 (Letter #4).

•   On October 22, 2002, Mr. Kapell sent a similar letter to Senator Charles Schumer. Pl.'s Mot. at 9; *see also* Ex. C, "Response from Charles Schumer"(Letter #5).

•   On November 18, 2002, Mr. Kapell sent a complaint letter to Mark Fraase of the DOJ Office of Professional Responsibility, on the mistaken belief that Mr. Steinbuch worked at the DOJ.  This letter added a different form of alleged unprofessional conduct:

> Mr. Steinbuch clearly lists himself on this document as: "Of Counsel". [sic] This document bears the letter head of a private Manhattan law firm.  I know that I am not a lawyer, but it seems that Mr. Steinbuch is trying to have it both ways.  In order to avoid the appearance of conflict of interest, Mr. Steinbuch has gotten his law school buddy, Mr. Schuyler Carroll[3], to file as the attorney of record.  But Mr. Steinbuch was the one writing the motions and Mr. Steinbuch was the one who appeared in court in front of Judge Underwood on September 12, 2002.  So in essence, Mr. Steinbuch is handling a private legal matter for the firm of Olshan, Grundman, Frome, Rosenzweig & Wolosky.  Is this behavior permissible for a Department of Justice attorney?  Don't these actions create a conflict of interest? . . . Since there is no written contract (required by law in NYS) this is a completely frivolous action.  Mr. Steinbuch simply is using his position as a lawyer to harass me on behalf of his twin sister.  Now I find out that Mr. Steinbuch may also be violating the rules of his own office and endangering the government's position in other litigation. In addition to contacting your office I have also filed my complaint with the Inspector General, Senator Charles Schumer, Senator Hillary Clinton, the Washington Post and Newsday.  Ex. C at 21 (Letter #6).

•   On December 19, 2002, the law firm of Russell & Fig, the Kapells' lawyers, wrote a letter to Mr. Fraase at the DOJ, "writing on behalf of [its] client Robert Kapell." Pl.'s Mot. at 10; *see also* Ex. C at 23 (Letter #7).

•   On January 14, 2003, Heather A. Fig of Russell & Fig wrote to Mr. Fraase at the DOJ, explaining, "the Kapells feel that they are being harassed by this bogus law suit

---

[3]  Mr. Carroll did not go to law school with Mr. Steinbuch.  Pl.'s Mot., Ex. C at 103, Affidavit of Robert Steinbuch ("Steinbuch Aff.") ¶ 4.

4

which Ms. Steinbuch would not be able to afford were it not for her brother acting as her attorney. . . . Please keep me updated on the progress of your investigation and the final outcome so that I may inform the Kapells of the same."  Ex. C at 25 ( Letter #8).

•      When the DOJ realized that Mr. Steinbuch was not a DOJ employee, the Chief of the Office of Professional Responsibility sent a referral memorandum to the Acting Inspector General at the Department of the Treasury, of which the IRS is a component agency.  This March 4, 2003, memorandum documented the complaint made by Mr. Kapell to the INS and DOJ accusing Mr. Steinbuch of unethical behavior and professional misconduct.  "In addition," the memo stated, "Mr. Kapell believes that Mr. Steinbuch advised his sister to non-consensually tape record a conversation that she and her boyfriend had with Mr. Kapell and his wife at a time when, it appears, the Kapells were represented by an attorney."  The DOJ advised Steven T. Russell, Mr. Kapell's lawyer, of the referral.  Ex. C at 27 (Letter #9).

•      On March 26, 2003, Ms. Heather Fig wrote again to the DOJ Office of Professional Responsibility, complaining about "a TIGTA employee, Robert Steinbuch."  TIGTA is the Treasury Inspector General for Tax Administration but Mr. Steinbuch did not work for TIGTA.  There is no explanation in the record on why Ms. Fig would continue to complain to the DOJ about a Treasury Department employee.  Ex. C at 30 (Letter #10).

•      On April 24, 2003, Special Agent Ron McKeever from the Office of the Inspector General of the Department of Treasury wrote a memo reflecting his interview with Mr. Kapell, in which

> KAPELL advised that the basis of the suit, which he considered was frivolous, involved the KAPELL's selling their residence to another party for a higher amount after Diane STEINBUCH met with and had a verbal agreement to purchase the KAPELL's residence.  .  .  .  According to KAPELL, STEINBUCH was aware that it was a frivolous suit and pursued it as a form of harassment.  KAPELL advised that STEINBUCH was representing himself as "of Counsel" with a law firm . . ., in which a member of the law firm was STEINBUCH's law school friend. . . . KAPELL advised that STEINBUCH's representation for his sister was free and it was easy for him to pursue the matter.   KAPELL felt that STEINBUCH was using his connections in an attempt to force him to sell his property to his sister. . . . KAPELL advised that he has spent approximately $10,000.00 defending against the frivolous suit and KAPELL advised that he just wanted the matter to be over. . . . KAPELL felt that STEINBUCH's actions

5

> in the case were purely vindictive and aimed at putting pressure
> on them in hope that the KAPELL's [sic] would cave in and
> sell to STEINBUCH's sister.  Ex. C at 32, "Memorandum of
> Activity" (Letter #11).

- On April 28, 2003, Mr. Kapell sent a letter to Special Agent McKeever, asserting:

> We filed a complaint with the government because we felt, and
> continue to feel, that we have been legally harassed by Mr.
> Steinbuch. . . .  We felt that Mr. Steinbuch instigated legal
> action against us in the hopes that we would "cave in" and sell
> to his sister.  He then kept the case going as long as he could to
> run up our legal expenses.  We have so far paid our attorney
> $8,647.61.  His sister had no legal expenses.  We filed a
> complaint against Mr. Steinbuch because we wanted him to
> cease his legal actions.  Now that we have won the law suit, we
> want to make sure that Mr. Steinbuich [sic] doesn't use his
> position with the IRS to further harass us.  Ex. C at 36 (Letter
> #12).

- Ms. Fig wrote another letter to Special Agent McKeever on May 8, 2003, repeating
the refrain: "It is my clients['] opinion that this law suit would never have been
initiated or gone this far if Ms. Steinbuch had [had] to pay for her attorney."  Ex. C
at 38 (Letter #13).

- In June of 2003, Mr. Steinbuch learned for the first time that he was the subject of
an internal investigation prompted by the Kapell letter-writing campaign.  Pl.'s Mot.
at 1.

- On July 2, 2003, Special Agent McKeever wrote a report detailing his interview with
Mr. Steinbuch.  This memo necessarily repeated the nature of the Kapells'
complaints of unethical and unprofessional misconduct.  Ex. C at 41 (Letter #14).

- Mr. Kapell wrote to Special Agent McKeever on July 17, 2003, to follow up on his
complaint.

> [In our complaint], it was our contention that Mr. Steinbuch
> was harassing us with legal action on behalf of his sister . . . .
> [P]apers were filed in NYS under the law firm of Olshan,
> Grundman, Frome, Rosenzweig & Wolosky, LLP.  The motion
> lists Robert Steinbuch "of counsel". [sic] It was also brought to
> your attention that Mr. Steinbuch appeared in court
> representing that same firm to argue the case on behalf of his
> sister before Judge William Underwood.  The case was decided

6

by Judge Underwood on March 21, 2003. Even after a motion was filed by Mr. Steinbuch to reargue the case, the Judge ruled in our favor. . . . The Judge lifted the lien that Mr. Steinbuch filed and the house was sold. On June 20, 2003, Mr. Steinbuch filed an appeal with the Appellate Court . . . . In the appeal, a legal motion submitted under the name of a second law firm: Ardent [sic], Fox, Kinter [sic], Plotkin & Khan, Pllc. [sic], Mr. Steinbuch's name appears on the motion "of counsel". [sic] Mr. Steinbuch clearly indicates on the top of the appeal that he wants to appear before the court on behalf of this firm to argue the case. This filing of an appeal by Mr. Steinbuch appears to us to be an obvious admission by Mr. Steinbuch that his real mission is to legally harass us and to do financial harm. . . . The house is now sold. . . . It is now indisputable that the purpose of the whole legal action is to legally harass and to do us financial harm. It doesn't cost Mr. Steinbuch or his sister a penny to file motions. Every time he files a motion it costs us $2,500 to $3,000 to respond. This is clearly a vendetta being carried on by Mr. Steinbuch. . . .

Now there is another issue here. My wife and I are law-abiding citizens of the United States. We are very concerned about the fact that Mr. Steinbuch is a very highly placed official in the IRS. Since he has already demonstrated that he is carrying out [a] vendetta[4] against us, we are worried that he will be able to use his position in the IRS to continue to harass us. Is Mr. Steinbuch going to have access to personal and private information about us through our tax returns? Is he going to use his position to have the IRS continually audit us in the same way that he carried out a frivolous lawsuit against us? We think that abuse of power is a serious issue.

. . . We are asking that the IRS look into this action and take appropriate action. [W]e have spoken to a large law firm in Boston that is very experienced in matters of litigation against the government. They have advised us to spell out our concern to you in detail, and to notify them immediately if the IRS takes any action against us which looks like a continuation of Mr. Steinbuch's vendetta against us. We do hope that the IRS does

---

[4] The so-called vendetta related only to Mr. Steinbuch's pro bono representation of his sister in the underlying law suit. *See* Pl.'s Mot., Ex. A, Deposition of Robert Kapell ("R. Kapell Dep.") at 247; Pl.'s Mot., Ex. A, Deposition of Joan G. Kapell ("J. Kapell Dep.") at 144.

not knowingly condone such behavior by an employee.  Ex. C
at 43-44 (Letter #15).

- On August 26, 2003, James R. Rice, Assistant Special Agent-in-Charge at the IRS, prepared a report on the details of the IRS investigation into the Kapell's charges against Mr. Steinbuch, necessarily repeating those charges in the document.  Ex. C at 46-59, "Report of Investigation" (Letter #16).

- Mr. Kapell complained to Special Agent McKeever on October 13, 2003, that the investigation was taking too long.

> I am very concerned that Mr. Steinbuch will use the office that he has to continue his vindictive harassment of my wife and myself. . . . It is beginning to look like this 'investigation' isn't going anywhere.  Is Mr. Steinbuch so powerful that he cannot be investigated?  Has he broken the rules or not?  Is he going to be allowed to use his position in the agency to personally harass my wife and my self [sic]?[5]  Ex. C at 61 (Letter #17).

- Mr. Kapell submitted a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to the Acting Inspector General of the Department of the Treasury on December 10, 2003, seeking a copy of the report of Special Agent McKeever.  Ex. C at 63 (Letter #18).

- On December 22, 2003, John M. Dalrymple, IRS Deputy Commissioner for Operations Support, sent a clearance letter to Mr. Steinbuch, telling him that "the allegations have been disproved and you have been cleared."  Ex. C at 65 (Letter #19).

At no time during the underlying litigation over the sale of the Kapell house did the Kapells or their lawyers at Russell & Fig file a motion in court for sanctions against Mr. Steinbuch for pursuing an allegedly frivolous lawsuit.  *See* J. Kapell Dep. at 160-61.  Neither the Kapells nor their lawyers at Russell & Fig ever contacted the New York State Bar to complain about Mr. Steinbuch's allegedly unprofessional conduct.  *See* R. Kapell Dep. at 157; J. Kapell Dep. at 154.

---

[5]  Asked if he really believed that Mr. Steinbuch would be allowed to use his position in to harass the Kapells, Mr. Kapell responded, "No, of course not – of course not."  R. Kapell Dep. at 261.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Plaintiff is a resident of the State of Maryland.  Defendants are residents of the State of New York.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because the parties are from different states and the amount in controversy exceeds $75,000.  *See Saadeh v. Farouki,* 107 F.3d 52, 54-55 (D.C. Cir. 1997).

### B.  Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This remedy is not a "disfavored procedural shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  To be deemed "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case.  *Anderson*, 477 U.S. at 247-48; *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  It is a district court's duty to weigh the evidence and decide whether it is so one sided "that one party must prevail as a matter of law," or if there is a sufficient disagreement presented in the evidence such that reasonable minds may differ, therefore requiring the submission of the case to a jury.  *Anderson*, 477 U.S. at 251-52.

### III.  ANALYSIS

Because material facts remain in dispute, the Court cannot grant full summary judgment to either party.  However, certain legal claims can be addressed so that the allegations that do require a trial can be narrowed.

### A.  Tortious Interference with Contract

Mr. Steinbuch alleges that the Kapells tortiously interfered with his employment contract with the IRS.  In order to establish a *prima facie* case of tortious interference with contractual relations, a plaintiff must demonstrate four elements: "(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant[s], and (4) damages resulting from the breach."  *Sorrell's v. Garfinckel's,* 565 A.2d 285, 289 (D.C. 1989) (*citing Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 288 (D.C. 1977)). The parties dispute whether Mr. Steinbuch had an employment contract with the IRS and whether the Kapells had knowledge of it.  The Court can assume both of these facts in Mr. Steinbuch's favor but he cannot overcome the lack of evidence that the IRS breached any such employment contract.

A claim for tortious interference with a contract requires that the plaintiff demonstrate that the defendants induced a breach of the contract at issue.  Mr. Steinbuch relies on cases that hold that constructive discharge may arise from an involuntary resignation and can constitute a breach of contract.  *See Karp v. Roach*, No. 89-01276, 1991 LEXIS 11420, at *8 (D.D.C. Aug. 15, 1991). However, a claim for constructive discharge must allege facts indicating that the employer made working conditions "intolerable" and ultimately drove the employee to resign involuntarily.  *See Katradis v. Dav-El of Washington, D.C.*, 846 F.2d 1482, 1485 (D.C. Cir. 1988).

Mr. Steinbuch resigned because he concluded that his effectiveness at the IRS was compromised as a result of the Kapell letter-writing campaign. *See* Defendants' Motion for Summary Judgement ("Defs.' Mot."), Exhibits to Motion for Summary Judgment, Deposition of Robert Steinbuch ("Steinbuch Dep.") at 102 ("I felt that as a function of these false statements . . . [they] would impact my ability to be effective."). He based his decision to resign on discussions that he had with co-workers regarding the sometimes "insidious nature" of defamatory statements, *id.* at 102-03, and the "feeling" that he had that other employees he passed in the hallways were not as "friendly" or "effusive" as they once had been. *Id.* at 142. Apart from these feelings, which he admits are "a difficult thing to evaluate," *id.*, Mr. Steinbuch does not argue or present any facts from which it could be found that the IRS, his employer, made his working conditions intolerable or caused his involuntary resignation. Thus, because the IRS did not breach its employment contract with Mr. Steinbuch, it is axiomatic that there can be no "intentional procurement of [a] breach" of that contract by the Kapells. *See Sorrell's*, 565 A.2d at 289.[6] This flaw is fatal to Mr. Steinbuch's claim for tortious interference with contract. Accordingly, summary judgment will be granted to Defendants on this claim.

**B. Defamation**

The Court applies the choice of law principles of the District of Columbia in determining which state's law should be applied to Mr. Steinbuch's common law claim of defamation. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that

---

[6] It should be noted that even if Mr. Steinbuch had presented facts indicating that his employer made working conditions intolerable and such conditions ultimately led to his involuntary resignation, he has failed to establish that there is a causal connection between the employer's creation of those conditions and the Kapells' letter-writing campaign. Thus, even assuming that Mr. Steinbuch's employment contract was breached, he has failed to establish that the Kapells induced or "intentionally procured" that breach. *See Sorrell's*, 565 A.2d at 289.

federal district courts sitting in diversity must apply the conflicts laws of the forum in which they sit. The District of Columbia utilizes the government interest analysis test, which looks to the forum with the most significant relationship to the cause of action. *See Vaughn v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200 (D.C. 1997). In defamation cases, "[t]he weight of authority considers that the law to be applied is . . . [that of] the place where the plaintiff suffered injury by reason of his loss of reputation." *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984) (citing Restatement (Second) of Conflict of Laws § 150 cmt. e (1977)). Because Mr. Steinbuch worked in the District of Columbia and the statements were published in the District, the Court will apply local law.

Under District of Columbia law, "[t]o prove defamation, a plaintiff bringing a defamation action must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Carter v. Hahn*, 821 A.2d 890, 893 (D.C. 2003) (quoting *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (quoting *Crowley v. North American Telecomms. Assoc.*, 691 A.2d 1169, 1173 n.2 (D.C. 1977) (internal quotations and citations omitted)); *see generally*, Restatement (Second) of Torts § 558 (1977).

A statement is actionable in defamation under District of Columbia law if it is both false and defamatory. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). The plaintiff bears the burden of showing that the defendants' statements were false. *Liberty Lobby Inc. v. Dow Jones & Co.*, 171 F.2d 21 (D.C. Cir. 1948). "A statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the

community." *Wallace v. Skadden, Arps*, *Slate, Meagher & Flom*, 715 A.2d 873, 877 (D.C. 1998).

An "allegedly defamatory remark must be more than unpleasant or offensive; the language must

make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best*, 484 A.2d 958,

989 (D.C. 1984).  Moreover, when evaluating publications, "[t]he Court's function is to determine

whether the publication, taken as a whole, is defamatory, not whether two isolated statements might

be defamatory if published by themselves." *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 602

(D.D.C. 1977).

   Whether a statement is capable of a defamatory meaning is a question of law, but "it

is only when the court can say that the publication is not reasonably capable of any defamatory

meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter

of law, that it was not libelous." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir.

1990) (quoting *Levy v. American Mutual Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964)); *see Southern Air

Transport, Inc. v. American Broadcasting Companies, Inc.,* 877 F.2d 1010, 1013-14 (D.C. Cir.

1989).

   When the plaintiff in a defamation action is a public official or a public figure, he

carries a much heavier burden to establish that a particular statement is defamatory.  *See New York

Times v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Curtis Publishing Co v. Butts,* 388 U.S. 130, 152

(1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).  "Those who, by reason of the

notoriety of their achievements or the vigor and success with which they seek the public's attention,

are properly classified as public figures."  *Gertz*, 418 U.S. at 342.   In order to prevail on a

defamation claim, a "public official . . . must prove that [the defamatory statement] was made with

'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was

false or not." *New York Times*, 376 U.S. at 279-80.  Whether a government employee is a public official is a question of law for the court to determine.  *See Ayala v. Washington*, 679 A.2d 1057, 1064 (D.C. 1996); *Moss v. Stockard*, 580 A.2d 1011, 1029 (D.C. 1990).  The "'public official' designation applies at the very least to those among the hierarchy of government employees who have or appear to the public to have substantial responsibility for or control over the conduct of government affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

*1.  Are the Kapells' Letters Capable of a Defamatory Meaning?*

The Kapells accused Mr. Steinbuch of "legally harassing" them and violating ethical canons of professional responsibility because he was suing them on behalf of his sister without being paid for it.  Their intentions are admitted: they wanted to force Mr. Steinbuch to cease his representation of his sister on the theory that if Ms. Steinbuch did not have free legal help, she would be forced to drop her suit and they would be saved the cost of defense.  *See* Pl.'s Mot., Ex. C at 36 (Letter #12) ("We filed a complaint against Mr. Steinbuch because we wanted him to cease his legal actions.").  The Kapells also admit in this Court that they had reached an oral agreement to sell their home to Ms. Steinbuch and reneged on that agreement to get more money from someone else.  Their successful defense in the real estate litigation was that Ms. Steinbuch had actually signed a written agreement to buy the Kapells' house, as drafted by Mr. Kapell, but that the Kapells did not sign it, after saying that they would do so and send copies to Ms. Steinbuch.

In full fury that Ms. Steinbuch should dare to enlist her brother to sue them without paying attorney's fees for his efforts, Mr. Kapell contacted Mr. Steinbuch's supposed employer -- the INS, the DOJ, and finally, the Department of Treasury – as well as the Senators from New York State.  In these communications, the Kapells accused Mr. Steinbuch of a laundry list of unethical and

14

unprofessional misconduct: that he advised his sister to secretly record her conversation with the Kapells; that he was pursuing litigation merely to harass them and carry out a vendetta; that he was improperly working outside of his government job for two private law firms; that he may be violating the rules of his office and endangering the government's position in other litigation; that his "vendetta" made the Kapells anxious that he would abuse his IRS position to "access . . . personal and private information about [the Kapells] through [their] tax returns," Ex. C at 44 (Letter #15), and cause the IRS to "continually audit us," *id.*, and that he would use his position to "continue his vindictive harassment" of the Kapells. *Id.* It takes real *chutzpah* to fail to live up to your word and then attack the ethics of someone who tries to enforce the agreement.

It is well-established that a statement is defamatory if the statement tends to injure the plaintiff in his trade or profession, or if the statement lowers him in the estimation of the community. *See Wallace*, 715 A.2d at 877; *Moss*, 580 A.2d at 1023. Moreover, where false representations concern the plaintiff's *professional* character in his office, trade, occupation, or business, such representations are defamatory per se. *Wallace*, 715 A.2d at 877-78 ("One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect [her] fitness for the proper conduct of [her] lawful business, trade or profession . . . is subject to liability without proof of special harm") (citing Restatement (Second) of Torts § 573 (1977)).[7]

---

[7] *See also* Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 2.8.2 (3d ed. 1999) ("To be actionable per se – without proof of special damages – a slanderous statement must fall within one of four categories: (1) allegations that the plaintiff committed a crime; (2) allegations that would tend to injure the plaintiff in his or her trade, business, profession or office; (3) allegations that the plaintiff has contracted a loathsome disease, . . . (4) . . . unchastity.").

Mr. Steinbuch is a practicing attorney, and many of the statements made by the Kapells in their letters were a direct attack on his conduct and behavior as an attorney. The Court concludes that these statements are patently defamatory. *See Wallace*, 715 A.2d at 878. As noted by the New York Supreme Court in *Kraushaar v. LaVin*, 42 N.Y.S.2d 857, 860 (Sup. Ct. 1943), "[b]ecause of the nature of the duties performed by the lawyer[,] moral character and fitness are . . . essential . . . . It is therefore obvious that to call a lawyer 'unethical' is to impugn his fitness to practice his profession." *See also High v. Supreme Lodge of the World*, *Loyal Order of Moose,* 7 N.W.2d 675, 677 (Minn. 1943) (holding that a defamatory charge imputing to an attorney "lack of due qualification, misconduct or want of integrity is slanderous and actionable per se"). The Court further concludes that although some of the Kapells' letters may not qualify as patently defamatory because they did not concern Mr. Steinbuch's professional character or ethics as an attorney, such statements are, at minimum, "capable of a defamatory meaning." *Wallace*, A.2d at 878. "Therefore, a jury is responsible for determining whether the letters actually conveyed a defamatory meaning and whether [Mr. Steinbuch] can establish the other elements of defamation . . . ." *White*, 909 F.2d at 514.[8]

The Kapells argue that all of their statements were either statements of opinion and not actionable, or they were "potentially" true. Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Opp.") at 8. These arguments are without merit. Faced with the affidavits, sworn testimony and other evidence of record, the Kapells cannot rely on generalized hopes that a fact is "potentially" true. *See Beatty v. Washington Metropolitan Area Transit*

---

[8] The Court will set a special hearing to determine which letters and communications are defamatory per se and which letters are merely "capable of a defamatory meaning," and will therefore go to a jury.

16

*Authority*, 860 F.2d 1117, 1121 (D.C. Cir. 1988).  In any event, to complain that a lawyer is abusing

the legal system to "harass" a victim in a "personal campaign to bully them" is certainly capable of

a defamatory meaning, *i.e.*, that the lawyer has engaged in conduct violative of the Code of

Professional Responsibility deserving of discipline and approbation.  The defense illustrates the

defamation.

### 2. Is Mr. Steinbuch a public figure?

In their defense, the Kapells argue that Mr. Steinbuch is a public figure who, in

accordance with the Supreme Court's decision in *New York Times v. Sullivan*, must prove "actual

malice" to recover.  *See* 376 U.S. at 279-80.  The Court disagrees.

First, the Kapells did not rely on Mr. Steinbuch's alleged status as a public figure

when they wrote their letters: they did not know where he worked or what he did.  Second, the

Kapells did not raise any issue of public importance: they only wanted to provoke Mr. Steinbuch's

employer into forcing him to cease his pro bono representation on a totally private matter.  Third,

the Kapells did not encounter Mr. Steinbuch in his role as a government employee: their interactions

took place totally within the confines of a private lawsuit until the Kapells enlarged the audience

through their letter-writing campaign.  The Supreme Court has clearly defined the meaning of

"public figure" for the purposes of the First and Fourteenth Amendments:

> For the most part those who attain this status have assumed roles of especial
> prominence in the affairs of society.  Some occupy positions of such
> persuasive power and influence that they are deemed public figures for all
> purposes.  More commonly, those classed as public figures have thrust
> themselves to the forefront of particular public controversies in order to
> influence the resolution of the issue involved.

*Gertz*, 418 U.S. at 345.   Mr. Steinbuch held the position of Deputy Senior Counselor to the Commissioner of the IRS.   This is a quintessential "staff" position whereby a true public official can receive confidential advice and counsel from a person who otherwise wields no authority or power. It is just *barely* possible that Mr. Steinbuch might qualify as a public figure if the Kapells had encountered him in his role as an attorney at the IRS.   But that is not what happened.   Mr. Steinbuch was performing the unexceptional role of volunteer lawyer for his sister in a purely private dispute. That he might possibly be a "public figure" in other circumstances does not transform him into a public figure on the facts and circumstances presented in this case.   *See Gertz*, 418 U.S. at 351-52. Therefore, negligence is the appropriate standard to be used here.[9]

> 3.   *Were the statements privileged?*

There are "many common law privileges recognized in the District of Columbia law of defamation, composed of absolute privileges such as those enjoyed by judges or legislators in the

---

[9] Because Mr. Steinbuch is not a public figure, the higher standard of *New York Times v. Sullivan* – "actual malice" – does not apply.   However, were it to apply, the Court would be hard-pressed on this record to find no malice, due to the reckless and intentionally ignorant allegations advanced by the Kapells.   Mr. Kapell admits that he did not know who employed Mr. Steinbuch or what his employer's policy was on representation of family members, but he just hoped his complaints would result in stopping the litigation against him.   R. Kapell Dep. at 150-51.   Mr. Kapell did not ask the INS for a copy of its policy.   *Id.* at 176, 178, 182.   In fact, Mr. Steinbuch was well within IRS policy to take annual leave time to participate in the litigation on behalf of his sister.   *See* Pl.'s Mot., Ex. C at 96, Deposition of Michael Shaheen ("Shaheen Dep.") at 21. The Kapells never contacted the state bar association to find out where Mr. Steinbuch actually worked, J. Kapell Dep. at 154, and they never asked their attorneys to find out where he worked. R. Kapell Dep. at 85.   The Kapells now admit that they had no factual basis for their allegation that Mr. Steinbuch advised his sister to secretly record conversations with them.   R. Kapell Dep. at 187-88; J. Kapell Dep. at 97-98.   The Kapells had no factual basis to allege that Mr. Steinbuch was "the one writing the motions."   R. Kapell Dep. at 92-93; *see* Ex. C at 21 (Letter #6).   The Kapells admit that they did not think that Mr. Steinbuch would be allowed to use his position to harass them.   R. Kapell Dep. at 261 (Q.   "But in this [Letter #17] you state that 'Is he going to be allowed to use his position in the agency to personally harass my wife and myself?' Did you actually believe that he would be allowed to use his position?" A.   "No, of course not – of course not.").

course of their official conduct and conditional or qualified privileges, . . . defeated upon a showing of malice." *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980).   The Kapells argue that their letters and conversations were privileged because they were part of petitions for redress of grievances, arose in the course of a quasi-judicial proceeding, and were written and uttered in self-defense.   The Court finds that each of these arguments is wholly without merit.

### a.  Petition for redress of grievances

The Kapells assert that they were "concerned with possible wrongdoing by Plaintiff" and that they "feared that what they believed was harassment could continue with Plaintiff's authority within the IRS."  Defendants' Motion for Summary Judgment ("Defs.' Mot.") at 14-15. They cite *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977), *cert. denied*, 434 U.S. 975 (1977), as an analogous case that found complaints against an IRS agent to be privileged as a petition for redress of grievances.   This privilege shields communications by private citizens which inform government officials of possible wrongdoing by their subordinates.  *Id.* at 1342-43.   In *Stern*, corporate officers of the defendant allegedly defamed Mr. Stern when they complained about his conduct during an IRS audit, but the Seventh Circuit found the communications privileged under the First Amendment as a petition to redress grievances.  *Id.* at 1343.

The logic of *Stern* does not apply here.   In *Stern*, the Seventh Circuit made it clear that any privilege stemming from a complainant's right to petition is limited to instances where the complainant has had "official dealings" with the party about whom the complaint is made.  *Id.* at 1342-43 ("We think it plain that presenting complaints to responsible government officials about the conduct of their subordinates with whom the complainer has had official dealings is analogously central to the protections of the right to petition.").   The Kapells had no official dealings with Mr.

Steinbuch as an attorney with the IRS.  In addition, Mr. Steinbuch was not a subordinate to anyone

with the INS, the Office of Professional Responsibility of the DOJ, the Inspector General of the DOJ,

Senator Hillary Clinton or Senator Charles Schumer.

Perhaps most importantly, the Kapells admit that they wrote and mailed their letters

and made follow-up telephone calls in an attempt to pressure Mr. Steinbuch to withdraw from

representing his sister and not because they had any factual basis to believe that he had engaged in

the misconduct of which they charged him.  There is no public policy reason to stretch the privilege

for redress of grievances to cover this type of conduct.

### b.  Quasi-judicial proceeding

Courts in the District of Columbia extend an absolute privilege to defamatory

statements that are "published incidental to judicial proceedings . . ., providing the statements are

relevant to the proceeding.  The application of absolute privilege has been extended to encompass

quasi-judicial proceedings conducted by administrative bodies . . . ."  *Mazanderan v. McGranery*,

490 A.2d 180, 181-82 (D.C. 1984); *see also Brown v. Collins*, 402 F.2d 209, 212 (D.C. Cir. 1968).

The Kapells claim that this privilege shields their letters and statements from suit.  They contend that

Mr. Kapell "wrote letters to institute an administrative investigation into the internal rules for

government attorneys to represent relatives."  Defs.' Mot. at 16.

The absolute privilege sought by the Kapells is significantly more narrow than their

argument recognizes.  The investigation of a complaint does not constitute a "quasi-judicial

proceeding."  *White*, 909 F.2d at 523. This point is clarified in *White*, where the Chief of Police

empaneled a three-person committee to investigate a complaint.  *Id.* at 516.  The task force

conducted multiple interviews and reviewed numerous documents. *Id.* at 524. Nonetheless, because

the committee did not perform "traditional adjudicatory processes such as the holding of formal hearings and did not possess the power to issue a ruling that could be enforced or appealed," its investigation did not constitute a quasi-judicial proceeding.  *Id*.   In order to be protected, a proceeding must be "sufficiently judicial in nature to warrant application of the absolute privilege . . . ." *Id.*

There were none of the accouterments of a judicial or adjudicative proceeding associated with the Kapells' complaining letters and telephone calls.  The letters were sent to two different branches of government and few of them were directed to Mr. Steinbuch's actual employer.  The quasi-judicial privilege obviously does not apply.  *See Brown v. Collins*, 402 F.2d 209, 212 (D.C. Cir. 1968) ("There are Bar grievance committees especially established to consider complaints concerning conduct of attorneys, and they are charged with responsibility for protecting the public.[10] . . . Where such an institution exists, there is little hospitality to the claim that moral duty mandates its circumvention.").

### c.  Privilege of Self-Defense

The District of Columbia recognizes self defense as a qualified common law privilege that can constitute a complete defense to a defamation claim.  *See Morsie v. Trussell*, 467 A.2d 475, 477 ( D.C. 1983); *Dickins v. Int'l Bd. of Teamsters*, 171 F.2d 21 (D.C. Cir. 1948).  "When the author of a libel writes . . . for the protection of his own rights or interests, that which he writes is a privileged communication unless the writer be actuated by malice."  *Dickins*, 171 F.2d at 24.  The Kapells argue that they were "attempting to protect their financial interests, defend themselves in litigation in which Plaintiff was clearly an important part, and protect [] their right to use or sell their

---

[10] If the Kapells did not know this fact, their attorneys certainly did and could be expected to so advise them.

property as they saw fit . . . ." Defs.' Mot. at 17. Again, the Kapells stretch the common law privilege beyond its setting. This argument has no merit.

First, the Kapells made their communications for the purpose of forcing Mr. Steinbuch to withdraw from representing his sister and with the object of causing her to drop her lawsuit against them. *See* R. Kapell Dep. at 86, 92, 129-30, 133, 150. As Mr. Kapell candidly informed the Treasury Inspector General for Tax Administration, "We filed a complaint against Mr. Steinbuch because we wanted him to cease his legal actions." Ex. C at 36 (Letter #12). The letters were used as a sword against Mr. Steinbuch, not as a shield for the Kapells.

Second, the "self defense" privilege applies in a very narrow set of circumstances. The two cases cited by the Kapells demonstrate this point. In *Morsie v. Trussell*, the statements at issue were made by a police officer in his fitness hearing in direct response to allegations of wrongdoing against which he was defending himself. Similarly, in *Dickens v. International Bd. of Teamsters*, union officers made statements to the press in direct response to accusations printed by the press accusing them of wrongdoing. Here, Mr. Steinbuch merely represented his sister in a vain attempt to enforce an oral agreement; he did not attack the Kapells. The appropriate "defense" for the Kapells was in the state courts of New York and, if they and their lawyers truly believed a word they wrote, before the Bar Grievance Committee. *See Brown*, 402 F.2d at 212. Having ventured so far afield from those appropriate venues, the Kapells cannot now rely on an inapposite privilege.

## C. Infliction of Emotional Distress

Mr. Steinbuch has made claims for damages caused by intentional and/or negligent infliction of emotional distress. The Kapells move to dismiss all such claims as a matter of law. The

Court cannot make the necessary determinations on the record as it stands and will therefore deny Defendants' motion for summary judgment on these counts.

## IV. CONCLUSION

For the reasons stated, the Court will grant the parties' motions for summary judgment in part and deny them in part. Mr. Steinbuch's allegations that the Kapells tortiously interfered with his employment contract will dismissed and summary judgment will be entered for Defendants on this count. The Court concludes that the letters from the Kapells concerning Mr. Steinbuch's representation of his sister that impugn his character and his ethics as an attorney are defamatory per se. The other letters and communications, which may not be patently defamatory, are nonetheless capable of a defamatory meaning and should therefore be evaluated by a jury. Moreover, the Court finds that these statements were published without any absolute or qualified privilege. Mr. Steinbuch is not a public figure and does not need to prove actual malice. Accordingly, Mr. Steinbuch's defamation claim will not be dismissed and Defendants' motion for summary judgment on this count will be denied. Finally, the Court cannot make a determination concerning Mr. Steinbuch's claims for intentional and negligent infliction of emotional distress on this record. Therefore, Defendants' motion for summary judgment on these counts will be denied.

A separate order accompanies this Memorandum Opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: March 23, 2006.